BROWNING–FERRIS INDUSTRIES OF ILLINOIS, INC., et al. Plaintiffs,

v.

Richard TER MAAT, et al., Defendants.

No. 92 C 20259.

United States District Court, N.D. Illinois, Western Division.

July 29, 1998.

Pierre C. Talbert, Katz, Randall & Weinberg, Chicago, IL, William Beck, Gary D. Justis, Lathrop & Gage, L.C., Kansas City, MO, for Plaintiffs.

Patrick Fanning, Knight, Hoppe, Fanning & Knight, Des Plaines, IL, Edward M. Maher, Law Offices of Edward Maher, Rockford, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

REINHARD, District Judge.

### INTRODUCTION

Plaintiffs filed this action for contribution and declaratory relief pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), as

amended, 42 U.S.C. §§ 9607 and 9613 and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking monetary damages against defendants for the past and future costs incurred to respond to environmental contamination at the MIG/DeWane Landfill Superfund Site located in Boone County, Illinois. The Court conducted a two-week bench trial in January 1998 and set a briefing schedule for the parties to submit post-trial briefs setting forth the issues and citing the trial evidence relevant thereto.[1] This order will decide the legal issues, make the necessary factual findings, allocate liability among the parties and assess damages against defendants where appropriate.

## BACKGROUND

The site (also termed a facility as defined in CERCLA) at issue is an approximately forty-seven acre landfill located near Belvidere in Boone County, Illinois. The property during the entire relevant time period was owned by Raymond DeWane, Jean A. Farina and L.A.E., Inc. who leased it for operation of a landfill. It was operated as a landfill from February 1969 to June 1988. During that time, a variety of residential, commercial and industrial waste was placed in the landfill.

The landfill initially consisted of an excavated area which was lined with five feet of clay as required by the state landfill permit. About 45,000 cubic yards of waste were placed in the excavation between February 1969 and March 1971. The operator of the landfill during that time left it in poor condition and there was suspected contamination of the groundwater by leachate.[2]

In early 1971, the owners leased the landfill to Browning–Ferris Industries of Illinois, Inc. (BFI).[3] BFI sought and obtained a new landfill permit from the Illinois Environmental Protection Agency (IEPA) in May 1972 to operate the site. The landfill began receiving waste in April 1973, although on a limited basis. In September 1973, when a nearby landfill closed, the landfill began receiving waste on an unlimited basis. BFI operated the landfill until October 1975.

BFI's permit required a five-foot, compacted clay liner and a gravity-powered leachate collection system which fed into a surface impoundment. Additionally, daily, intermediate and final earthen cover was required.[4] There is no evidence to show that BFI did not comply with these requirements. During its operating period, BFI admittedly placed about 375,000 cubic yards of waste into the landfill. At the end of BFI's operation, it closed and placed a final cover over the area it had landfilled.

Beginning in October 1975, the owners leased the landfill to defendants.[5] Defendants operated the landfill from October 1975 to June 1988. During that time, they deposited approximately 3.5 million cubic yards of waste. MIG was the operator per the lease and AAA was a transporter to the landfill. Richard Ter Maat served as an officer of both corporations.

After filing a site closure plan with the IEPA, which was rejected because the owners refused to sign it, defendants left the landfill without properly closing it, including no final cover. MIG lacked the funds to effectuate a proper closure. AAA was sold, and Richard Ter Maat moved to Florida. Defendants took no part in operating or closing the landfill after June 30, 1988.

In August 1990, the United States Environmental Protection Agency (USEPA) placed the landfill on the national Priorities

---

1. The court compliments the attorneys from both sides for the exemplary manner in which they tried this case and their extensive efforts in preparing the post-trial briefs.

2. Leachate may be described as the end result of water leaching through a substance and collecting soluble compounds in the process.

3. The original lease was to Rockford Disposal Service, Inc., the predecessor to BFI. The court will simply refer to the entities as BFI.

4. Cover is a prescribed level of soil to be placed over the waste to prevent its movement by the wind and to retard the amount of rainwater reaching the waste.

5. When the court refers to defendants, it means MIG, Inc., AAA Disposal, Inc. and Richard Ter Maat.

List (NPL) for clean-up under CERCLA. In October 1990 and again in March 1991, the USEPA and IEPA issued administrative orders on consent (AOC) to clean-up the landfill. Pursuant to these AOCs, plaintiffs were to: (1) conduct immediate waste stabilization measures, such as pump leachate from the surface impoundment, repair the impoundment berm and construct an interim cap on the landfill, (2) conduct a remedial investigation and feasibility study (RI/FS) pursuant to the NPL [6]; and (3) to pay past response costs and oversight costs incurred by USEPA and IEPA.

Plaintiffs filed this action in an effort to recover contribution for these costs, applicable interest and a declaration of liability as to future costs.[7] The future costs will depend on the Record of Decision (ROD) to be issued by USEPA which will set forth the needed measures to complete the clean-up and management of the landfill.[8]

Following the bench trial, the parties submitted post-trial briefs in which they set forth thirty-five issues to be decided by the court. The court will decide each of the issues in this order. The facts and evidence relevant to a particular issue will be discussed when the court decides that issue.

### Operator Liability

Plaintiffs assert liability against AAA and Richard Ter Maat as operators through theories of direct liability and derivative liability under state corporate veil-piercing law.[9] The court will first address the issue of direct liability.

6. The purpose of an RI/FS is to collect data, evaluate releases of hazardous substances and to conduct engineering evaluations sufficient to allow federal and state agencies to select remedies.

7. Defendants have never been involved with, or contributed to, the clean-up of the landfill despite their notification of potential liability by the USEPA and IEPA.

8. As of the time of trial, plaintiffs suggested the ROD would be issued in February or March 1998. As of the date of this order, plaintiffs have not advised the court of the ROD's issuance.

9. All parties stipulate that MIG was an operator at the site.

### 1. *AAA*

The United States Supreme Court has recently spoken on the issue of when a party can be held directly liable as an operator under CERCLA. *See United States v. Bestfoods,* ___ U.S. ___, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).[10] At issue in *Bestfoods* was to what extent, if any, a parent can be held liable as either an owner or an operator of a hazardous waste site owned or operated by its subsidiary. The court answered that the parent can be found derivatively liable as an owner or operator only if the corporate veil may be pierced in light of the applicable state law. *Bestfoods,* ___ U.S. at ___ ___, 118 S.Ct. at 1880–81. On the other hand, the parent can also be found directly liable as an operator, independent of any state veil-piercing law, if a plaintiff can show the parent actively participated in, and exercised control over, the operations of the site.[11] *Id.* at 1881. Any person or corporation who operates a site is directly liable for the costs of clean-up regardless of whether that person is the site's owner, the owner's parent corporation or business partner, or someone who sneaks in at night to discharge toxic waste at the site. *Id.* at 1885.

The difficulty comes in defining actions sufficient to constitute direct operation. *Bestfoods,* at 1885. Because the statute fails to adequately define the term "operator," the Supreme Court looked to its ordinary or natural meaning. In the organizational sense, which was the intent of CERCLA, operate means to conduct the affairs, manage, or operate a business. *Id.* (citing American Heritage Dictionary 1268 (3d ed.1992)).

10. This case was decided after the parties submitted their post-trial briefs. Plaintiff filed a motion to supplement its authority, citing *Bestfoods,* which defendants opposed. The court being aware of the *Bestfoods* decision independent of plaintiffs' motion, denied the motion as moot. Also, because of the *Bestfoods* decision, several of the joint issues need not be directly addressed.

11. The court recognizes that the two corporate defendants here, MIG and AAA, did not have a parent-subsidiary relationship. Nonetheless, because of their common ownership and directorship, they are sufficiently analogous to a parent-subsidiary (sister corporations seems an appropriate description) to make applicable the tenets of *Bestfoods.*

Therefore, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a site. *Id.* To sharpen this definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations. *Id.*

If the issue of direct liability as an operator is to be kept distinct from derivative liability, there must be no fusion of direct and indirect liability concepts. *Bestfoods,* at 1885. The question for direct liability is not whether the one corporation operates the other, but rather, whether it operates the site. *Id.* at 1886. Such operation is evidenced by participation in the activities of the site and not the subsidiary. *Id.* Control of the operating corporation, if extensive enough, gives rise to indirect liability under state law piercing doctrine, not direct liability under the statute. *Id.*

Having said that, the Court cautioned that it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary and that fact alone may not serve to expose the parent to liability for the acts of the subsidiary. *Bestfoods,* at 1886. This recognizes the well-established principle that directors and officers holding positions with a parent and its subsidiary can and do change hats to represent the two corporations separately despite their common ownership. *Id.* Therefore, it is not enough to establish direct liability as an operator that dual officers and directors made policy decisions and supervised activities at the site. *Id.* Rather, it must be shown that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as officers and directors of the parent and not as officers and directors of the subsidiary.[12] *Id.*

The court went on to discuss various possible scenarios where a parent corporation could be found directly liable as an operator. The first is where the parent operates the site in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture. *Bestfoods,* at 1887. The second possibility is where a dual officer or director might depart so far from the norms of parental influence exercised through dual office-holding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the site. *Id.* The third scenario is that an agent of the parent, with no hat to wear but that of the parent, might manage or direct activities at the site. *Id.* Norms of corporate behavior, undisturbed by any CERCLA provision, are crucial reference points. *Id.* The critical question is whether, in degree and detail, actions directed to the site by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's site. *Id.*

In the present case, the evidence shows that Richard Ter Maat, as an officer and director of AAA and MIG, was involved in the operational decision-making at the site. The dispositive question is whether his conduct and that of AAA was done outside the norms of corporate conduct so as to be considered done on behalf of AAA rather than MIG.[13]

The pertinent evidence establishes that MIG paid AAA a management fee to reimburse AAA, in part, for its performing certain administrative functions for MIG related to the site. Numerous outside parties who were involved with the site, including the IEPA and waste haulers, considered AAA to be the operator. Some venders sent correspondence and invoices to AAA for services related to site operations. Additionally, Richard Ter Maat sent several letters to the IEPA pertaining to operational matters at the site which he signed as president of AAA. He also sent a letter to the Illinois Division

---

12. Again, while the corporations in this case are not parent-subsidiary, they do share officers and directors. As such, the court finds the language of *Bestfoods* equally applicable here.

13. In considering the evidence on this issue, the court disregards the evidence related to AAA's control of MIG. Such evidence is clearly not pertinent to an analysis of direct liability as an operator under CERCLA. *See Bestfoods,* at 1886 ("The question is not whether the parent operates the subsidiary, but rather whether it operates the site. . . .").

of Land/Noise Pollution Control pertaining to an operating permit for the site which was also signed by him as president of AAA. While defendants attempted to explain these letters away as aberrations, the letters speak for themselves. Furthermore, there are several letters from AAA's environmental consultant, M. Rapps Associates Inc., addressed to Richard Ter Maat and AAA which discuss pollution and clean-up issues at the site.

■ On the other hand, as defendants point out, there is also correspondence between Rapps and MIG and the IEPA and MIG which also pertains to operations at the site. All this shows, however, at best is that AAA and MIG both were involved as operators at the site. Nothing in CERCLA, or the case law interpreting it, prohibits a finding of more than one operator liable for a site.

■ The court finds that there is sufficient evidence, irrespective of the evidence related to AAA's control of MIG, to conclude that AAA was, at the very least, a joint operator of the site. As such, AAA bears direct liability under CERCLA for the clean-up costs. The court will determine AAA's share in a separate section of this order. Having found AAA directly liable as an operator under CERCLA, the court need not address the issue of whether AAA is liable indirectly under a veil-piercing theory.

### 2. *Richard Ter Maat*

■ While the *Bestfoods* decision offers significant guidance on the meaning of an operator for purposes of direct liability under CERCLA, the Court was careful to point out that CERCLA does not impinge on established corporate principles under state law. *See Bestfoods*, at 1880. Prior to *Bestfoods*, however, the Seventh Circuit held that a corporate officer could be held directly liable as an operator under CERCLA irrespective of state veil-piercing law. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420–21 (7th Cir.1994). This court respectfully believes that the *Bestfoods* case directly applies to, and therefore trumps, the *Sidney S. Arst* decision. Consequently, the only way plaintiffs can attribute individual liability as an operator to Richard Ter Maat,

as an officer of both MIG and AAA, is derivatively under state veil-piercing law.

■ Efforts to pierce the corporate veil are governed by the law of the state of incorporation, *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 933 (7th Cir.1996), which in this case is Illinois. In Illinois, a corporation's veil of limited liability may be pierced only if there is such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and if the circumstances are such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Hystro Prod., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir.1994). In determining whether to disregard a corporate entity, the court will consider a number of factors, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation at the time; (6) nonfunctioning of other officers or directors; (7) absence of corporate records; and (8) whether the corporation is a mere facade for the operation of dominant stockholders. *Ted Harrison Oil Co., Inc. v. Dokka*, 247 Ill.App.3d 791, 187 Ill.Dec. 441, 617 N.E.2d 898, 901 (4th Dist.1993). The court may also consider whether the dominant individuals commingled corporate funds with personal funds or preferred themselves as creditors. *Id.* When such factors are coupled with some element of injustice or fundamental unfairness, the corporation will be considered as an aggregate of persons both in equity and law and its officers, directors and shareholders will be held liable for the corporation's obligations. *Id.* That being said, a court should reluctantly pierce the corporate veil. *Id.* The party seeking to have the corporate entity disregarded must come forward with a substantial showing that the corporation is really a dummy or a sham for a dominating personality. *Id.*

The present case is unique as the officers, directors and shareholders, of which Richard Ter Maat is more than one, chose to set up two corporations, one to operate the site (MIG) and another to haul garbage to the site (AAA). At first glance, one might be

suspicious that two corporations were formed where one could do the job. But that is the nature of corporate law, and there are many legitimate benefits, not the least of which is related to taxes, that might motivate such an organizational move. Moreover, nothing in CERCLA purports to reject the bedrock common-law principle respecting corporate structure. *Bestfoods* at 1883. The particular structure and functions of the corporation alone do not justify attributing liability to Richard Ter Maat individually.

■ Plaintiffs contend that Richard Ter Maat is liable as the alter ego of MIG and AAA.[14] The court will assess this contention in light of the various factors recognized under Illinois law, keeping in mind plaintiffs' burden of a substantial showing.

First, there is no evidence of undercapitalization. While MIG did not have tremendous resources, it was able to function financially on its own for many years. Second, stock was issued by both corporations. Third, corporate formalities were in fact observed. The evidence shows that while Richard Ter Maat was president of each corporation, decisions were made collectively. Simply because Richard Ter Maat demonstrated a leadership role does not reflect dominance. Additionally, regular meetings were held and books were kept for both corporations. Both corporations also filed corporate tax returns. Similarly, each corporation employed a controller, Phil Stevens, to maintain corporate accounting functions. Fourth, the evidence shows that the other officers and directors performed specific, identifiable functions for each corporation. While Richard Ter Maat may have been the leader, it was not a one-man show. Fifth, although plaintiffs point to some questionable corporate minutes, the overall evidence demonstrates that corporate records were maintained for both MIG and AAA. Sixth, there is no evidence sufficient to show that either corporation was a mere facade for the operation of Richard Ter Maat. These foregoing factors do not justify piercing the corporate veil.

The remaining factors, while arguably supporting piercing the corporate veil of MIG, are insufficient to do so in light of the factors pointing the other way and plaintiffs' burden of a substantial showing. There was no evidence of any payment of dividends, although that is not entirely unusual in small corporations. As for the insolvency of MIG, it only became insolvent once the CERCLA obligations were imposed on it. Prior to that time, it maintained its own financial vitality. The fact that AAA prospered comparatively does not show MIG's insolvency. Lastly, there is some suggestion that AAA and Richard Ter Maat preferred themselves as creditors. Given the unusually low tipping rates charged AAA by MIG (irrespective of AAA's volume), the lease arrangement for heavy equipment and the management fees paid by MIG to AAA, it is evident that AAA prospered at MIG's expense. Such an arrangement is not entirely unusual as between two corporations. Ultimately, of course, Richard Ter Maat received the benefit of AAA's prosperity through the sale of AAA. Whether that was part of some grand fraudulent scheme or only last minute manipulations by a shrewd business person, the evidence simply does not answer. Hinting at or suggesting such matters is not enough in light of state corporate law. The court finds that plaintiffs have failed to prove a basis to pierce the corporate veil as to either AAA or MIG.

### Admissibility of Parnello Affidavit

On June 24, 1988, BFI submitted, via its legal counsel, the affidavit of one of its employees, Joseph E. Parnello, to the United States Environmental Protection Agency (USEPA). The letter accompanying the Parnello affidavit states, in pertinent part, that the affidavit is submitted in response to the USEPA's contention that BFI "has a continuing obligation to supply information relevant to Belvidere Municipal Landfill No. 1." The letter further states that the Parnello affidavit "attests to the types and volumes of waste hauled from the Chrysler plant ... to the Belvidere Municipal Landfill No. 1 from

---

**14.** Of course, plaintiffs need only pierce the corporate veil of either MIG or AAA to achieve their goal of attributing liability to Richard Ter Maat.

1967 to 1973." It further asserts that Parnello "started hauling Chrysler's waste in 1967 and continues to haul this waste to this day." The letter also includes a list of the types and approximate amounts of waste hauled from Chrysler for the seven-year period.

Parnello's affidavit itself states, in relevant part, that Parnello was hauling Chrysler waste to a BFI landfill in Davis Junction, Illinois and that he had hauled Chrysler waste to the Belvidere Municipal Landfill No. 1 from 1967 to 1973. Parnello also states that "[a]ll of the waste [he] hauled from Chrysler was taken to the Belvidere Municipal Landfill No. 1 until the landfill closed in 1973." The Parnello affidavit further states that during the seven-year period he hauled: approximately 15,000 gallons of infilco sludge every two months, approximately three to five 20 cubic yard loads per week of paint sludge, approximately three to five loads of fly ash per week depending on the season, approximately two to five 30 yard loads of metal debris and scrap per week and approximately two 15 yard loads per day of industrial wastewater sludge. According to Parnello, Chrysler also disposed of about sixty drums of waste per week, with some of the drums containing solvents, tar or metal scraps.

Defendants seek to admit the Parnello affidavit as circumstantial evidence of what type and volume of Chrysler waste was hauled by Parnello during the period of 1973 to 1975. Plaintiffs contend the affidavit is inadmissible hearsay.

■ Federal Rule of Evidence 801(d)(2) governs the admissibility of the Parnello affidavit. Rule 801(d)(2) provides that an admission by a party opponent is not hearsay, and therefore admissible, if it "is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by

the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship...." Parnello's affidavit, while arguably admissible under subsection (A), qualifies as an admission by BFI under subsection (B), (C) and (D). The cover letter by BFI's attorney reflects that BFI had adopted a belief in its truth as it was submitted to the USEPA and also that BFI authorized Parnello to make the statement. Additionally, as to subsection (D), Parnello was an employee of BFI at the time he made the affidavit and it concerned a matter within Parnello's employment. Accordingly, the court admits the Parnello affidavit as an admission by BFI.

### Chrysler Waste

The parties have presented the twin issues of whether an adverse inference can be drawn based on Chrysler's alleged failure to produce all documents relevant to disposal of its wastes for the period 1973 to 1975 and whether such an inference can be attributed to BFI for its similar failure. A related issue is whether section 103(d) of CERCLA, 42 U.S.C. § 9603(d), required BFI to retain all records of its operation at the site. The court finds it unnecessary to decide these issues as there is sufficient evidence to infer that Chrysler waste did in fact go to the site during the period 1973 to 1975.

The undisputed evidence shows that Parnello, a BFI employee, exclusively hauled the Chrysler waste from at least 1967 to 1973. Additionally, the undisputed evidence demonstrates he exclusively hauled Chrysler waste after 1975. Other evidence strongly suggests that he also hauled the Chrysler waste from 1973 to 1975.

The big mystery, of course, is where did he haul it during the 1973–75 period. In that regard, the evidence shows that from 1967 to 1973 Parnello hauled all of the Chrysler waste to BFI's site at Belvidere Municipal Landfill No. 1 and that from 1975 forward he hauled it to BFI's new site at Davis Junction.[15] David Boque, a management level

---

**15.** The evidence shows that for a short time in 1975 he hauled Chrysler waste to the Pagel Pit in Rockford, Illinois. That was between the time

employee of Chrysler, testified by deposition that he was aware of Parnello hauling Chrysler waste to Belvidere Municipal Landfill No. 1 before 1973 and to Davis Junction from sometime in 1975 thereafter. Curiously, Boque had no knowledge of where Parnello hauled Chrysler waste from 1973 to 1975. Furthermore, BFI applied for a permit in early 1973 from Illinois Environmental Protection Agency to deposit liquid wastes from Chrysler in the site.

Additionally, an employee of BFI at the site, Kenneth Bodey, testified at trial that while he worked there Parnello hauled Chrysler waste to the site. According to Bodey, once or twice a week Parnello would bring in a twenty-yard container containing two different sludges. One sludge Bodey described as purple in color with a stiff consistency which he referred to as number five sludge and described as paint sludge. The second sludge, referred to as number seven sludge, was gray in color with a soft, but not liquid, consistency. Bodey described this as sewage sludge. Neither sludge smelled like solvents. Bodey also testified he saw Parnello bring infilco waste into the site in a twenty-yard box. According to Bodey, he also saw fly ash and cinders hauled into the site by Parnello, at a rate in the winter of two to three loads per day. To Bodey's knowledge, BFI's trucks went only to the site and no other landfill while BFI operated the site. While Bodey saw Parnello haul drums into Belvidere Municipal Landfill No. 1, he never saw him haul drums to the site.

Cleatos Atkinson, the former general manager of BFI, testified, and the documentary evidence shows, that in mid–1975 BFI sought and received significant hauling and disposal rate charges for liquid waste in the agreement covering 1973 to 1976. This was at about the same time BFI began hauling Chrysler waste to Pagel Pit and then Davis Junction.

When the court views this evidence in its entirety, the inescapable conclusion is that BFI hauled Chrysler waste, including sludges and infilco waste, to the site during the period of 1973 to 1975. The more difficult questions are how much was deposited and to what extent did these wastes contain solvents.

In that regard, the court finds persuasive the expert opinion of defendants' witness, Paul R. Ammann. According to Ammann, BFI contributed approximately 3,430,000 pounds of solvents to the site between April 1973 and June 1975.[16] This amount is based on the number of vehicles manufactured by Chrysler during this time period and the approximate amount of solvent-bearing waste generated therefrom. According to Ammann, the 3.4 million pounds of solvents deposited by BFI at the site represents about 91 percent of the total solvent content at the site.[17] The question of the impact of solvents at the site will be addressed when the court decides the allocation issue.

### Appropriateness of Damages Under the NCP

Defendants contend that plaintiffs have failed to carry their burden of proving that the response costs they seek to recover were both necessary and consistent with the National Contingency Plan. *Peppers* counsel for defendants [18] further identifies 13 examples which he contends are not recoverable special damages.

Section 107(a)(4)(B) of CERCLA imposes liability on potentially responsible parties (PRPs) for "any other necessary costs of response incurred by any other person consistent with the National Contingency

---

BFI relinquished control over the site and when it opened its new operation at Davis Junction.

16. This conclusion is based on the assumption that BFI dumped all the Chrysler waste during the relevant period at the site. In its prior discussion, the court has already found such assumption to be supported by the evidence. The court, therefore, finds that about 3,430,000 pounds of solvents are attributable to BFI's hauling of Chrysler waste to the site.

17. Ammann attributed the remaining nine percent to MIG based on the amount and nature of municipal and industrial trash hauled by MIG during its operating period as per records.

18. *See Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976) (Insured entitled to independent counsel where potential conflict of interest exists under insurance policy.)

Plan." 42 U.S.C. § 9607(a)(4)(B). Proof that a private party's response costs were consistent with the NCP is an element of a private cost recovery action under CERCLA. *Bancamerica Commercial Corp. v. Trinity Indus., Inc.,* 900 F.Supp. 1427, 1451 (D.Kan.1995). The 1990 NCP, which applies to this action, specifies that any response action "carried out in compliance with the terms of an order issued by EPA pursuant to section 106 of CERCLA, or a consent decree entered into pursuant to section 122 of CERCLA will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700(c)(3)(ii). Private party response actions not made pursuant to an EPA order or decree require substantial compliance with a list of requirements in order for the response action to be considered consistent with the NCP. 40 C.F.R. § 300.700(c)(5)–(6). Response actions taken pursuant to an EPA order or decree will be found consistent with the NCP if the actions were in compliance with the order or decree. *Trinity Indus.,* 900 F.Supp. at 1452; *United States v. Colorado & Eastern R.R. Co., Inc.,* No. 89–C–1786, 1993 WL 350171 (D.Colo. 1993), *aff'd,* 50 F.3d 1530 (10th Cir.1995); *Central Maine Power Co. v. F.J. O'Connor Co.,* 838 F.Supp. 641, 647 (D.Me.1993). In fact, there is an irrebuttable presumption that actions taken pursuant to the terms of an EPA consent decree are consistent with the plan. *Central Maine Power,* 838 F.Supp. at 647.

■ In this case, the undisputed evidence shows that the response costs sought by plaintiffs were for actions taken pursuant to two administrative orders on consent executed after April 9, 1990. Therefore, the court finds the costs are consistent with the NCP.

Defendants contend that the oversight costs sought by plaintiffs related to the emergency removal and RI/FS activities are not recoverable, relying on *United States v. Rohm and Haas Co.,* 2 F.3d 1265 (3d Cir. 1993). The Seventh Circuit has not addressed the issue. Two other circuit courts of appeals have, in addressing the issue, rejected the conclusion and reasoning of the

*Rohm* case. *See United States v. Lowe,* 118 F.3d 399 (5th Cir.1997); *see also Atlantic Richfield Co. v. American Airlines, Inc.,* 98 F.3d 564 (10th Cir.1996) (limiting *Rohm* to the narrower circumstance of removal actions).

■ After carefully reading all three cases and the applicable statutory provisions under CERCLA, the court respectfully disagrees with the Third Circuit and follows the decisions of the Fifth and Tenth Circuits. It appears that allowing oversight costs to be recovered best serves the broad remedial purpose of CERCLA and promotes the effective clean-up of environmental hazards. Accordingly, the court finds that plaintiffs are entitled to recover all of the oversight costs of the USEPA and IEPA.[19]

Defendants, alternatively, contend that certain costs are not recoverable and present an enumerated laundry list of contentions and commentary as support for their position. The court finds that the evidence supports plaintiffs' claims for costs as to all these matters. Only two warrant further discussion.

■ First, defendants contend plaintiffs' additional expenses of $392,055.89 in PRP search costs were duplicative and done in anticipation of litigation. Patrick McGrath, vice-president of Peterson Consulting, testified that $378,450 was expended to identify PRPs through the identification of generators and transporters and the specific volumes of waste they hauled or sent to the site. According to McGrath, this function was necessary to facilitate the de minimis settlement process. Furthermore, McGrath's expert report shows a delineation of the various tasks conducted by Peterson Consulting as part of the PRP search process. The court agrees that PRP search costs are not limited to the name of the PRP alone. Information related to who brought what and how much is particularly relevant to the de minimis settlement process. McGrath's testimony and report sufficiently support the claim for the costs related to the PRP search process. There-

---

**19.** Even if the court were to follow the *Rohm* decision, the oversight costs related to the RI/FS activities would still be recoverable.

fore, the court finds plaintiffs are entitled to the full amount sought.

Second, defendants contend that plaintiffs' claims for attorney fees are not recoverable because such claims are vague and plaintiffs have not shown they are "closely tied" to the actual clean-up. Plaintiffs respond that they are not seeking recovery for items related to litigation support in Golden & Associates' bills, that the bills from the law firms of McDermott, Will & Emery and Kirkland & Ellis are for administrative services provided to the MLTF and not legal services and that the computerized legal research charge from Lathrop & Norquist was for locating PRP addresses.

 While plaintiffs' claims include some work performed by attorneys, they have shown it is "closely tied" to the actual clean-up activities. Defendants' objections do not specify particular costs that are attributable to litigation matters versus clean-up matters. Defendant agreed to do so where they believed there were discrepancies, and the court will not comb the record in search of such problems. Plaintiffs have sufficiently shown that their costs of $8,036,608.87 are necessary and consistent with the NCP.

### Allocation of response costs associated with the emergency removal actions and the interim remedial measures (IRM)

Plaintiffs' expert, Edwin Raymond, testified in his trial affidavit that the costs associated with the emergency removal actions and the IRMs were $2,305,183.44 as of December 31, 1997. Plaintiffs contend that defendants[17] should be responsible for this entire amount because of their failure to properly close the site when they abandoned it in 1988. Plaintiffs further maintain that there will be future operation and maintenance costs associated with the IRMs and that the court should enter a declaratory judgment attributing all of the future costs to defendants.

Defendants respond that they should not be held liable for the full amount of the emergency removal and IRM costs because

the presence of solvents, which were introduced by BFI, caused the emergency and interim remedial response. Defendants further contend that a portion of the costs should be attributed to the owners of the site because they had a legal obligation to participate in the proper closure of the site which was not eradicated by the agreement between the owners and defendants.

As will be seen in more detail later in this order, allocation of response costs is far from an exact science. This is equally true in the context of who should pay what for the emergency removal and IRM costs. Here, there are three potential parties: plaintiffs, defendants and the owners. The court will discuss each.

 As for BFI, there is simply no evidence, expert or otherwise, to show that anything they did attributed to the need to take emergency removal and IRM action. There has been no showing that the toxicity contributed by BFI via the Chrysler waste stream caused these actions to be taken. While such toxicity will have an impact on the court's allocation for the other clean-up costs, it has no effect in this context. There is also no showing that anything else BFI did years before contributed in any way to the emergency nature of the initial response and the interim measures taken. There is also no evidence that BFI's closure of the site in 1975 contributed to these costs. Nor did the law impose any obligation on them to effect closure in 1988. Therefore, the court attributes zero percentage of the emergency removal and IRM costs to plaintiffs.

As for defendants, they clearly had an obligation under applicable regulations to properly close the site. It is also undeniable that they failed in this undertaking. Further, the experts, both plaintiffs' and defendants', agree that failure to properly close the site contributed to the need for emergency removal and IRM activities. Defendants left the site without proper slope and without a proper cap which resulted in excessive ponding of water and runoff of water, both of which contributed significantly to the exten-

---

**17.** The court has already decided that Richard Ter Maat has no individual liability as an opera-

tor under either CERCLA or state veil-piercing law.

sive leachate problem. There is no doubt that had the site been properly closed the need for emergency and interim actions would have been minimized. Defendants must share significantly in the costs for the emergency removal and IRMs.

That leaves the owners. Plaintiffs contend the owners should escape responsibility because they had an agreement with defendants that gave defendants the obligation to close the site. Nevertheless, the law places the responsibility for closure on both the owners and defendants. This obligation could not be bargained away. The evidence shows that, not only did the owners fail to take any action to close the site, they interfered with defendants proposal to do so by refusing to sign off on the closure plan submitted to the IEPA. While the court does not express an opinion on defendants' proposed closure plan, the key at this point is that the owners' refusal to become involved reflects a hands-off approach contrary to their legal obligations. As will be discussed more thoroughly later in this order in the allocation issue, the owners could not sit back and reap great financial rewards from their land while the very use of the land for which they benefitted contaminated the environment. Equity, which is the underpinning of the allocation process, will not allow it.

■ Having determined that defendants and the owners share the responsibility for the costs associated with the emergency removal and IRM activities, the court must decide what share each will bear. Of course, there can be no exactitude in this process.

■ That being said, and having carefully considered the evidence, including the expert reports and testimony, the court finds that defendants are eighty-five percent responsible and the owners are fifteen percent responsible. This division of responsibility is based on the fact that the operators were in the best position to effectuate a closure but refused to do so. While the owners foiled

defendants' attempt to seek approval from the IEPA for defendants proposed closure, that did not prevent defendants from closing the site anyway. It was a poor exercise of judgment by defendants to throw up their hands and walk away simply because of the lack of cooperation by the owners.[18] A proper closure would have made a significant impact on the cleanup and response costs. On the other hand, the owners are not squeaky clean in all of this. Their persistent inclination to stick their heads in the sand is an irresponsible approach that cannot be overlooked. Had they and defendants worked together to close the site, which the law contemplated them doing, much environmental harm could have been avoided. As for future costs related to the IRMs, the court enters a declaratory judgment against defendants and the owners based on these percentages.

*Whether MIG and AAA [19] should be considered a single party for purposes of allocating response costs*

■ Plaintiffs contend that section 2(a)(2) of the Uniform Comparative Fault Act should apply and that MIG and AAA should be treated as a single party for allocation purposes. The court disagrees. In a contribution action such as this one under section 113 of CERCLA, defendants are severally liable and plaintiffs have the burden of allocating the harm to each defendant. *See Ninth Ave. Remedial Group v. Allis Chalmers Corp.*, 974 F.Supp. 684, 688 (N.D.Ind. 1997). While it is true that MIG and AAA share the role of operator, they cannot share the liability. Any allocation of liability will take into consideration their dual role as operators of the site during their period of operation. In all likelihood each will bear an equal share of their joint allocation which will be decided in the allocation portion of this order. Such a result would not be inconsistent with several liability under section 113.

---

**18.** While the parties could not bargain away their legal obligations, the fact that defendants had the sole responsibility for closure under the agreement further reflects their poor judgment in abandoning the site without effective closure.

**19.** Plaintiffs contend all three parties, MIG, AAA and Richard Ter Maat should be treated as one. This court has held in a separate part of this order, however, that Richard Ter Maat cannot be held individually liable as operator either directly or derivatively.

**Whether defendants can be declared liable for future response costs pursuant to section 113(g)(2) of CERCLA**

Defendants object to the entry of a declaratory judgment against them for future response costs in the form of final remedial action. Defendants contend such costs are too speculative to base a declaratory judgment on. Defendants also argue that because the baseline risk assessment's focus shifted from solvents to metals after the close of discovery that they will be denied due process if they are not allowed to explore the bases for the metals-division remedy for future clean-up.

 Section 113(g)(2) of CERCLA provides that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." This language reflects Congress's intent to insure that a responsible party's liability, once established, will not have to be relitigated. *American Nat'l Bank and Trust Co. of Chicago v. Harcros Chem., Inc.*, No. 95 C 3750, 1997 WL 281295, at *12 (N.D.Ill. May 20, 1997). The entry of a declaratory judgment as to liability is, therefore, mandatory under CERCLA. *Id.* (citing *United States v. USX Corp.*, 68 F.3d 811, 819 (3d Cir.1995)). Moreover, the fact that future costs are speculative is no bar to a present declaration of liability. *Id.* Additionally, defendants do not cite, and the court cannot find, any authority recognizing a due process claim in this context. Defendants have had the same opportunity as plaintiffs to consider and respond to the USEPA's approach to this case. Allocation responsibility can be assessed at this point and applied to future response costs.

**Whether plaintiffs are entitled to interest from defendants on plaintiffs' costs related to the site**

Plaintiffs seek interest at the rate of 5.6% for a period from January 31, 1995, the date they served a demand letter upon defendants, to the date of judgment. Defendants only objection is to reiterate their contention that plaintiffs are not entitled to recover certain underlying clean-up costs as argued in other sections of their post-trial brief. Defendants do not raise any argument directly in opposition to the imposition of interest for the period or the rate sought.

Because section 107(a) allows for interest, and defendants have not directly objected to its imposition, the court will award interest for the time period and rate sought. Such an award will only apply, however, to the percentage of costs awarded to plaintiffs and against defendants as set forth in other sections of this order.

**Whether solvents caused the listing of the site on the National Priorities List (NPL) or caused any element of the remedy**

As plaintiffs correctly point out in their reply brief, the issue of what caused the site to be placed on the NPL is of no consequence as to what remedies are ultimately necessary to clean up the site. On the other hand, while plaintiffs' experts point to the remedies as being driven by the presence of metals, there is also evidence that volatile organic compounds (VOCs) are also present in significant levels. Furthermore, VOCs, while present in solvents, are also found in ordinary municipal and industrial waste.

It cannot be said that the remedies in this case are entirely independent of solvents. The court has already found that Chrysler waste, which included solvents, was placed in the site during the BFI period. It may prove impossible to separate the solvent from the non-solvent VOCs. That, however, supports the court's conclusion that the remedies are likewise indivisible. Accordingly, the court finds that solvents are, in part, causing some elements of the remedy. The court will apportion this causation in its allocation discussion.

**Whether defendants closed the site on June 30, 1988**

Plaintiffs contend that under the state environmental regulations applicable at the time, *see* Ill.Admin.Code tit. 35, §§ 807.101 *et seq.* (807 regulations), defendants failed to properly close the site but instead abandoned it. Defendants make a half-hearted response, essentially blaming the owners and

the IEPA for preventing them from properly closing the site.

The court will take little time addressing this issue. While several aspects of this case are murky, it is crystal clear that defendants walked away from the site without properly closing it. No legitimate argument can be made that defendants did not abandon the site within the meaning of the 807 regulations. Therefore, the court finds that the site was not closed by defendants on June 30, 1988 or anytime thereafter.[20]

### Whether defendants should bear any of the orphan share

■ An orphan share in the context of CERCLA contemplates an inability to account for all hazardous waste streams or to assign a measure of monetary responsibility to an otherwise responsible party. *United States v. Kramer*, 953 F.Supp. 592, 595 (D.N.J.1997). The parties here do not take issue with this definition. Rather, they disagree as to whether defendants should bear any of the orphan share in this case.

■ In a contribution action such as this one, the court enjoys broad discretion to consider and apply such equitable factors as it deems appropriate to achieve a just and fair allocation among liable parties. *Kramer*, 953 F.Supp. at 597. Section 113(f) permits the court to allocate response costs to *all* liable parties. *Id.* at 598. Thus, nothing in CERCLA or its legislative history prohibits the court from allocating orphan shares to all liable parties. *Id.; see also Charter Township of Oshtemo v. American Cyanamid Co.*, 898 F.Supp. 506, 508 (W.D.Mich.1995) (in a section 113(f) contribution claim, the orphan shares must be equitably apportioned among all solvent PRPs). Furthermore, the orphan shares should be apportioned to the PRPs (both plaintiffs and defendants) according to their relative equitable share. *Kramer*, 953 F.Supp. at 598; *Charter Township*, 898 F.Supp. at 509.

The court agrees with the analysis in *Kramer* and *Charter Township* and rejects the contentions of defendants. To allocate

orphan shares to all liable parties is not inconsistent with several liability under section 113. Additionally, such an approach is entirely consistent with equitable considerations applicable to an allocation scheme under section 113. To properly effectuate the purposes of CERCLA, all liable and solvent parties must share the cost in proportion to their relative fault.

In this case, plaintiffs' expert, William Hengemihle, testified that approximately 34,-615 cubic yards of waste are attributable to orphan operators and about 510,580 cubic yards to orphan transporters. According to Hengemihle, the total orphan share is 1.58 percent to be distributed on a pro rata basis to all parties. Defendants have not countered this allocation. Accordingly, the court accepts Hengemihle's apportionment of the orphan share to the respective parties, including defendants.

### Whether BFI violated its landfill permit by failing to remove the waste deposited in the Kennedy–Mollendorf area prior to May 5, 1972

It is undisputed that BFI's landfill operating permit, issued by the IEPA, contained a special condition, among others, requiring BFI to remove the waste from the Kennedy–Mollendorf area and to seal the area according to design specifications. It is further undisputed that BFI never met that condition. What is in dispute is whether the IEPA modified BFI's permit by allowing BFI to leave the waste but requiring it to take certain actions, including covering the waste with clay.

It is not clear whether BFI actually complied with the substitute conditions, even if they were approved by IEPA. Contrary to BFI's assertion in its post-trial brief, Raymond De Wane did not testify that BFI complied with the special conditions. Rather, De Wane testified that cover was placed on the Kennedy–Mollendorf area during its use prior to BFI becoming the operator. There is some indication that BFI covered the Kennedy–Mullendorf area and that they

---

**20.** Such facts as the owners' recalcitrance and defendants' legitimate attempts to close, if any,

will be considered in allocating costs.

placed no additional waste there, as reflected by the site characterization memorandum. There is no evidence however, to show that the other conditions were met.

Nonetheless, the court cannot conclude that the IEPA ever formally approved the substitute conditions. Clearly, several letters from the IEPA to BFI during the early to mid-part of 1973 reflect the IEPA's insistence that the original condition be met and that BFI remove the waste from the Kennedy–Mollendorf area. The memorandum from the July 23, 1973, meeting between BFI, Wallace Koster and the IEPA is nothing more than that, a memorandum. It is far from an official authorization from the IEPA. In fact, one would expect a supplemental permit to have issued had the IEPA formally approved the change. The fact that the IEPA records after July 23, 1973, do not indicate a continued belief by the IEPA that BFI was violating its permit is not particularly persuasive.

Therefore, the court finds that the original condition of the permit regarding the Kennedy–Mollendorf area was not modified or substituted for by the IEPA. Having reached that conclusion, the court finds that BFI did not comply as it never removed the waste. The significance of this finding, if any, will be addressed in the allocation section of this order.

*Whether Richard Ter Maat's deposition testimony can be considered substantively as admissions of a party where he also testified at trial*

Richard Ter Maat's deposition testimony contains admissions by a party and is, therefore, admissible as substantive evidence. Fed.R.Evid. 801(d)(2). It may be used as substantive evidence at trial even if Ter Maat testifies (which he did here). Fed.R.Civ.P. 32(a); *Aircraft Gear Corp. v. Kaman Aerospace Corp.*, No. 93 C 1220, 1996 WL 65990, at *1 (N.D.Ill. Feb.12, 1996); *W.R. Grace & Co. v. Viskase Corp.*, No. 90 C 5383, 1991 WL 211647, at *2 (N.D.Ill. Oct.15, 1991).

Having said that, the court also finds the submitted evidence from Ter Maat's deposition to be vague and of little evidentiary value. Much of what Ter Maat testified to regarding his activities related to the site

could apply equally to his role as an officer of MIG. Absent an opportunity for further explanation, such statements have little evidentiary weight.

*The environmental conditions at the site prior to October 1975 and whether BFI and the owners had a duty to disclose those conditions to defendants*

Defendants contend that the groundwater at the site was "contaminated" prior to their becoming operators in October 1975, that BFI and the owners had a duty to disclose the condition and that they wilfully failed to disclose the condition in an effort to spread liability under CERCLA. Defendants assert that this failure to disclose should effect the allocation of responsibility for response costs.

Wallace Koster testified that as of March 1972 he believed there was a "strong likelihood" that the groundwater at the site was being polluted by previous refuse disposed of at the site. In fact, Koster stated such possibility in a letter to the Illinois Division of Land Pollution Control (predecessor of the IEPA) as part of the application process to operate the site in March 1972. According to Koster, he believed as of March 1972 that due to the geological conditions of the Kennedy–Mollendorf area that it would "in all likelihood lead to groundwater pollution." Furthermore, a testing company hired to test the groundwater sent results to Koster stating that two of the water samples "had a distinct garbage odor" which indicated that leachate was contaminating the groundwater. BFI also admits that the groundwater samples from 1971–72 showed increases in metals, clorides, hardness and dissolved solids. According to BFI, no tests were done to ascertain if any solvents or VOCs were in the water.

Ter Maat testified that he requested the information submitted by Koster from the IEPA but the IEPA refused to provide it because BFI considered the information a trade secret. According to Ter Maat, the IEPA refused to provide the information on "many, many occasions." There is no evidence to show that BFI ever made Ter Maat aware of the "strong likelihood" of groundwater contamination or of the test report stat-

ing that the groundwater samples smelled like garbage or contained increased levels of metals, chlorides, hardness and dissolved solids.

■ It is not necessary for the court to now conclude whether BFI had a hard and fast duty to disclose such information back in 1972. On the other hand, the court considers such evidence relevant to the issue of BFI's conduct as it bears on the equitable considerations of allocation.

### Whether the settlement by BFI and CNA Insurance Companies is admissible to show bias of plaintiffs' allocation expert and the ability to pay of the owners

During trial, defendants sought to have Floyd Wisner, an attorney who had represented the CNA Insurance Companies (CNA), testify regarding a settlement agreement entered into between BFI and CNA pertaining to numerous insurance policies and insureds. Defendants contended at that time that such evidence was relevant to the issue of the owners' ability to pay and to the issue of the bias of the proposed allocation by BFI to be attributed to the owners. Wisner then testified as an offer of proof. After hearing Wisner's testimony via the offer of proof, the court ruled that it did not consider the evidence admissible but would reconsider after the parties briefed the issue post-trial. The parties submitted their post-trial briefs on this issue under seal, as the transcript of Wisner's testimony on this issue was under seal.

In their post-trial brief, defendants contend that Wisner's testimony shows that BFI and the other plaintiffs "postur[ed] with their experts to assign a minimal amount of liability through their allocation expert to the owners." In essence, defendants contend that Wisner's testimony is relevant to attack plaintiffs' allocation scheme and the motivation for it. Plaintiffs contend such evidence is irrelevant and not admissible under Rule 408 of the Federal Rules of Evidence.

Rule 408 generally prohibits evidence of settlement negotiations except "when the evidence is offered for another purpose, such as proving bias or prejudice of a witness...."

In this case, Wisner's testimony is offered to show the bias or prejudice of plaintiffs' allocation expert.

■ The court stands by its original ruling that such evidence is inadmissible. There must be significant reason to admit evidence of otherwise confidential settlement agreements under Rule 408. Defendants have simply not established the nexus between BFI's settlement dealings with CNA and BFIs' allocation expert's opinion as to what allocation is attributable to the owners. Clearly, because BFI settled with the owners and therefore acquired the owners' allocation responsibility, it is motivated to keep that allocation as low as possible. There is no showing that the settlement with CNA injected any bias into the allocation expert opinion that would not otherwise be there as a result of the allocation expert being a witness testifying on behalf of BFI.

### Limit of plaintiffs' contribution rights

This is really a non-issue in this case. It appears from the post-trial briefs that the issue is based on semantics and that the parties agree in substance that plaintiffs are entitled to seek contribution for $8,036,608.87 before any settlement set-offs and allocation are applied or any pre-judgment interest is assessed.

### Whether BFI complied with the lease requiring it to provide insurance for, and indemnify, the owners

The relevance of this issue eludes the court. Even if defendants could establish that BFI did not comply with the insurance and indemnity provisions of the lease between BFI and the owners, that is of no concern to defendants. More importantly, it is of no concern to the court.

### Whether MIG complied with its lease provisions relating to rental payments, insurance agreements, indemnities and closure of the site

The court agrees with defendants that the issue of whether MIG complied with the lease requirements as to rent, indemnity and insurance has no relevance to this case. The issue of MIG's alleged violation of its lease is

no more relevant than the issue of BFI's compliance with its lease.

As for the lease provisions pertaining to conditions at, and closure of, the site, while arguably relevant, they are of negligible weight. There is ample evidence, independent of the lease, upon which the court can assess MIG's activity as it related to operation and closure of the site. It is the impact of that activity on the site, not its effect on the lease, that is critical to this court's allocation assessment.

### Whether MIG violated its operating permit by irrigating the landfill with leachate

It is undisputed that MIG did in fact recirculate leachate from the leachate pond back into the landfill and that such a practice was in violation of its operating permit. It is also undisputed, however, that inspectors for the IEPA were aware of this practice and never cited it as a permit violation. According to Robert Wengrow, who was in charge of the regional IEPA office having jurisdiction over the site, it was customary during that time period to handle leachate that way because there was nothing else that could be done with it.

 It is clear that MIG violated its permit by pumping the leachate from the collection pond back into the landfill. It is equally clear, however, that the IEPA was aware of the practice and allowed it to continue. While the IEPA's ratification of MIG's conduct does not eradicate MIG's responsibility, it does mitigate it significantly. The court will consider the entire circumstance of the situation when determining MIG's allocation responsibility.[21]

### The legal effect of the settlement proceeds received by plaintiffs

Plaintiffs have entered into settlement agreements with sixty-four parties regarding response costs who, in turn, assigned their contribution claims to plaintiffs. Further,

the USEPA reached a de minimis settlement with several PRPs as to response costs, with sixty-eight settlers assigning their contribution claims. Defendants contend that the actual amount of the settlements with the de minimis settlors and the third-party defendants should be credited against the RI/FS costs before any further allocation is determined. As for the settlement between plaintiffs and the owners, defendants contend that the owners actual allocated liability (as determined by the court) be setoff rather than the amount of the settlement itself.

 There are two recognized approaches for crediting the contribution of settling parties. One, the pro tanto rule considers the settlement amount. See Atlantic Richfield Co. v. American Airlines, Inc., 836 F.Supp. 763, 766 (N.D.Okla.1993). The other is the proportionate credit rule which applies the actual amount of allocated liability of the settling party. See Allied Corp. v. Acme Solvent Reclaiming, Inc., 771 F.Supp. 219, 223 (N.D.Ill.1990). Under the circumstances of this case, the court will apply the proportionate credit rule as that is the rule followed by courts in this circuit and by the majority of courts addressing the issue. See, e.g., United States v. SCA Serv. of Indiana, Inc., 827 F.Supp. 526, 533–36 (N.D.Ind.1993); Allied Corp., 771 F.Supp. at 223; Edward Hines Lumber Co. v. Vulcan Materials Co., No. 85 C 1142, 1987 WL 27368, at *2–3 (N.D.Ill.1987). As such, the court will consider the allocation amount for the settling parties when it takes up the allocation issues.

### Whether the owners had responsibility for leachate management at the site

The evidence does not support defendants' contention that the owners had responsibility for leachate management at the site. They rely on the 1972 permit application which provides that treated leachate would be used periodically to irrigate the owner's fields and

---

**21.** This circumstance epitomizes the overall problem with assessing liability in a CERCLA case such as this. The "science" of landfilling has changed, and continues to change, dramatically in twenty plus years. Back in the mid–1970's and into the 1980's the state and federal agencies were in their fledgling stages of devel-

opment. Additionally, the laws governing landfill operation were just coming into bloom. Now, of course, the court must assess in hindsight the actions of the operators through a present day lense. Imposing today's standards on yesterday's conduct is an inartful task at best.

that the owners would maintain the completed landfill. This certainly implies that the owners had responsibility for leachate maintenance once the site was completed (or closed). It does not imply, however, that they had responsibility for the leachate during the active operation of the site. Of course, the evidence shows that the site never was completed (or closed). Hence, any responsibility owed by the owners never came to fruition.

■ Moreover, even if it is assumed that the actual permit incorporated the permit application parameters, the permit changed the leachate requirement as to irrigating the fields. Thus, any contemplated responsibility for leachate management by the owners was eradicated when the IEPA disapproved the method called for in the permit application. Therefore, the court finds the owners had no responsibility for leachate management at the site.

### The proper method of allocating response costs

The landfill at issue in this case was in existence and actively operated from the late 1960s to the late 1980s. For twenty years, a variety of waste was brought to, and deposited in, the landfill. Over 3.5 million cubic yards of waste were landfilled during that time.

All during this time, as the volume and variety of waste increased, what was there began to decompose. The decomposition process resulted in the waste returning to its base constituencies. This further led to a complex and ill-defined mass of substances.

All of this waste also contained a certain amount of water which mixed with the base elements from the decomposition process to create what the experts call leachate but which may fairly be described as toxic soup. This "soup" eventually intermixed from various locations throughout the landfill and worked its way into the surrounding soil and finally into the groundwater. And like grandma's special soup, the final product was the result of a unique blend of ingredients, some known and some unknown.

Now the parties ask, and the law requires, that this court analyze the "soup" and determine who put in which ingredients and how much. Like someone trying to figure out what makes Coke taste the way it does, this is no easy task. Unraveling a twenty-year process involving millions of cubic yards of waste and complex ecological, biological and geological forces is likely to yield less than precise results.

The parties have each taken a stab by offering their experts' opinions as to who should be responsible for what. But the expert opinions merely reflect the imprecision of the task at hand. And, of course, each parties' experts' ultimately arrive at conclusions which most favor their clients. For example, plaintiffs conclude that volume should be the only basis for allocating responsibility. Defendants, on the other hand, preach toxicity and cost causation as the way to go.

Further complicating matters, is the evolving nature of the law itself and its application to this particular landfill. In the early and midyears of the landfill, the law was in its embryonic stages. Techniques for operating a landfill, which today seem archaic, were acceptable back then. Methods that were approved ten to twenty years ago are being rejected today. It is difficult to attribute fault on such a sliding scale. Much of what was done acceptably back then is now improper when viewed through the lens of today's regulatory schemes.

Additionally, as to the many issues raised in this case, most of which ultimately bear on the allocation issue, there is little guidance in the way of case law, particularly at the appellate level. This is most likely due to the fact that many of these cases settle. The high rate of settlement is probably attributable to the inherently unpredictable results a trial will bring. Further, most of the cases performing allocations rightfully caution that each case is unique and should provide little, if any, guidance in future allocation matters. Given the dearth of cases on many of the issues, combined with the less than precise language of CERCLA itself, the court is plowing new ground on many issues. The bottom line is the court is left with an under-

developed legal framework in which to resolve the many issues raised by the parties.

Of course, because an allocation in a CERCLA contribution action is an equitable matter, the court may take into consideration all relevant conduct of the parties that might demonstrate fault on their part. This results in an inordinate amount of mudslinging in an effort to make each party look like the bad guy. Unfortunately, this has a tendency to detract from other issues in the case which require the parties' and the court's attention. Not only that, but neither party comes out smelling like a rose. There is ample evidence that all parties failed to play entirely by the rules (some of which were surely changed in the middle of the game) and also contributed significantly, whether by volume or toxicity, to the contamination at the landfill.

After having analyzed many cases, considered numerous articles, reviewed volumes of evidence and studied the post-trial briefs, the court concludes that the allocation in this case will be a "best guess" proposition within the exercise of its discretion. The court will, of course, make every effort to carefully consider all relevant factors in assessing responsibility. Ultimately, however, that assessment will be limited by the nature of what must be considered. And, as has been said many times before, the allocation arrived at here should not be applied to other factual scenarios in other cases.

Both parties in this case have presented their suggested methods of allocating response costs. In support of their respective positions, they have submitted testimony and reports from allocation experts. In turn, the experts have rendered allocation opinions that are based on percentages attributable to the various classes (owners, operators, generators and transporters) and then percentages within each of the classes. Additionally, the experts take into consideration various equitable factors, each giving different factors varying amounts of weight in arriving at their final conclusions.

While the court appreciates the efforts of the parties and their experts, ultimately the equitable allocation of response costs belongs to the court. As discussed previously, this is a task immune to precision. Although dollars are at issue, and, hence, numerical divisions are inevitably called for, any numerical assessment will be illusory at best.

That being said, there are several propositions that the court will definitively apply in allocating costs in this case. First, the court does not find volume alone to be an adequate measure of allocation. Such an approach ignores many other relevant factors, the most important of which is the conduct of the parties. Second, although defendants' cost allocation approach is much more expansive in its application, the court cannot agree with defendants' emphasis on toxicity. While the knowing placement of toxic substances in the landfill reflects relevant conduct of the parties, any effort at quantifying toxicity as it relates to the ultimate problems at the landfill is nearly impossible under the disputed testimony of the experts in this area. Finally, while both parties' experts' approaches have some redeeming qualities and take into consideration some relevant conduct, they are, in their efforts to identify waste streams and establish a nexus between those streams and the ultimate clean-up costs, somewhat wanting. After considering the experts' testimony and reports, the court is convinced that there are significant limits as to the qualitative and quantitative conclusions that can be reached in this case.

The court finds that the truest measure to assess equitably the liability in this case is to consider the conduct of the parties as it relates to their respective categories of owner, operator, generator and transporter. In other words, liability should be based on a percentage of fault rather than a percentage of volume or a percentage based on a particular waste stream. Such factors that bear on fault include: (1) how much waste was contributed; (2) the type and nature of the waste; (3) compliance with regulatory schemes; (4) operation of the landfill, including closure and post-closure activities; and (5) cooperation and involvement in cleaning up the site. The court will consider each of these factors and others as it applies to the relevant conduct of the parties. This will

provide an evidentiary basis for the allocation. Once that task is accomplished, the court will then assess a percentage of liability to each of the parties based on their relevant conduct as it relates to the condition of the landfill and the related response costs.

It is first necessary to make an inter-class allocation between the four statutory groups: owners, operators, transporters and generators. The court will assess a percentage of liability to each of these groups.[22] Once that is accomplished the court will determine the percentage of liability on an intra-class basis.

The first group the court will consider are the transporters. The court considers the transporters to have the most tenuous connection to the site.[23] They merely hauled waste to the site. They, with the exception of BFI and AAA, had no involvement in how the site was operated or whether the site operators complied with applicable regulations. On the other hand, they were necessary players in the creation of a massive garbage pile. The court finds, based on their relative contribution to the site in terms of bringing the waste there, that the transporters should be assessed a ten percent share of the present and future clean-up costs.

Turning to the generators, they were responsible for the waste in the first place. The waste, without which there could be no landfill, was the by-product of the generators' various operations, whether private or governmental. While they had no involvement with the operations of the landfill, they cannot avoid significant liability based on the sheer volume of the waste they created and contracted to have taken to the site. The court finds the volume of waste of the generators is the best method under the facts to determine fault of the generators. Accordingly, the court allocates forty percent of the present and future clean-up costs to the generator class.

That leaves the owners and operators. While the court will allocate a separate percentage of the entire liability to each of these groups, the court emphasizes that the owners group is, next to the operators, the most intimately related to the site in this case. The site was located on the farm where they resided and conducted other business operations. They were present at or near the site from time to time and were in a position to observe operations. Further, they received copies of various correspondence between the operators and state regulatory agencies concerning operations at the site and compliance with regulations. They also held regular meetings with the Ter Maats as to the status of the site and negotiated payment terms based on the volume of the waste going into the site. Over the entire period of the landfill operation they received payments of over one million dollars. Based on these circumstances, the court allocates a share of five percent of the present and future clean-up costs to the owners.

What remains is a forty-five percent share of the present and future costs to be allocated to the operators. The court finds this to be an appropriate share based on the extensive involvement of the operators in creating and managing the landfill. It was the operators who held the lion's share of responsibility for what went into the site, how it went in, where it went in and what happened to it after it went it. The operators also had primary responsibility for ensuring compliance with state and federal regulatory schemes. A forty-five percent allocation is an entirely appropriate assessment of liability to the operators.

There remains, of course, the issue of intra-class allocation as between BFI and MIG/AAA as operators and transporters. The court will first address the operator allocation issue. This allocation, which will be based on a whole percentage of the forty-five percent operator class share,[24] will reflect

---

**22.** Plaintiffs' and defendants' allocation experts, Hengemihle and Wise, agree that fifty percent of the liability based on volume should be allocated to the generator/transporter class. Taking this into consideration, the court, along with all the other evidence of fault, makes its independent allocation as to these two classes.

**23.** The exception, of course, is BFI and AAA who were also operators of the site.

**24.** This is exclusive of the orphan share attributable to the operator class.

consideration of the five aforementioned factors relevant to the fault of each. Once the relevant factors are discussed as to each, the court will arrive at a percentage for each.

As to the volume of waste, it is evident that the largest amount of waste was placed in the site during the MIG/AAA period of operations. Roughly 83 percent of the total volume of waste in the landfill was placed there during the MIG/AAA operation. Approximately 17 percent went in under the BFI era.[25]

Of course, these figures do not account for the approximately 3.4 million pounds of solvent-bearing waste brought to the site by BFI during its operating period. There is no evidence to quantify how the 3.4 million pounds of solvent waste computes into volume. Nonetheless, while the court will not strain to adjust the estimated percentages of volume, the court considers the additional Chrysler waste to have a volumetric impact significant to its assessment of this factor. In other words, BFI's liability will be based in part on the additional volume of waste it contributed to the site via the Chrysler solvent waste.

The next factor is the type and nature of the waste. For the most part, this factor is a wash as the waste going into the site during the BFI and MIG/AAA periods was a homogeneous stream of residential, commercial and industrial garbage. This factor would have little effect on the allocation equation except for the Chrysler solvent waste attributable to BFI. This waste was highly toxic and contributes to the groundwater contamination at the site. That is not to say, however, that the VOCs and SVOCs at the site all came from Chrysler waste. Some surely came from the other waste placed there. But it is undeniable the toxicity of the Chrysler waste had a significant impact at the site.

The Chrysler waste was also in liquid and semi-liquid form which would have accelerated its trip to the groundwater. The liquidity of the Chrysler waste would also have added to the mobility of other contaminates at the site. It did little good to place cover over the site to keep liquid out when liquid was being placed into the site. The court finds this factor to weigh heavily in its assessment of liability to BFI.[26]

The third relevant factor is the parties' compliance with applicable regulatory schemes. The court will first point out that it gives virtually no weight to the evidence of the IEPA's reports of non-compliance of MIG/AAA based on blowing litter at the site. This case is clearly not about blowing litter.

There is also evidence that MIG/AAA pumped leachate from the retention pond back over the landfill and that this was in violation of applicable regulations. While this fact will have more significance when the court discusses how the landfill was operated, it causes less weight under this factor as the evidence shows the IEPA was aware of the practice and allowed it to go on.

The fact that BFI placed Chrysler solvent waste into the site without obtaining the proper permits weighs heavily against BFI. It is one thing to allow litter to blow around, it is entirely another to dispose of over 3 million pounds of solvent waste knowing that the regulatory agencies were unwilling to allow such disposal.

Finally, as for the issue of BFI's failure to remove the waste deposited in the Kennedy/Mollendorf area prior to 1971, such non-compliance with their operating permit is minimized somewhat by the IEPA's knowledge of their non-compliance and its apparent willingness to allow it. While such non-compliance is relevant, it is not particularly weighty.

That brings the court to the issue of how BFI and MIG/AAA operated the site, including closure and post-closure conduct. As for BFI, its most significant downfall was the placement of 3.4 million pounds of liquid and semi-liquid solvent waste at the site. Without a doubt, this contributed substantially to

---

25. The court recognizes that about one percent was placed there during the brief period that Kennedy/Mollendorf operated the site pre–1971. This amount is of no import to the present allocation.

26. The expert testimony does not clearly establish the impact of the nature and toxicity of Chrysler waste at the site.

contamination at the site. Exactly how much, no one will ever know. But as discussed earlier, exactness is neither obtainable nor necessary in this case.

BFI also failed to excavate the Kennedy/Mollendorf waste which was located in what was once a gravel pit. While there was evidence on both sides of the issue, the court finds that the Kennedy/Mollendorf area was, to some degree, exposed to the groundwater, at least during the spring when water levels were higher. This finding is reinforced by the IEPA's requirement contained in BFI's operating permit that the waste in the Kennedy/Mollendorf area be excavated and moved to another part of the site. This failure to excavate the waste allowed leachate from the waste a much more efficient access to the groundwater. While it is not established from the evidence where this groundwater moved within or adjacent to the site, it is clear that it contributed to the overall contamination of the site.

As for MIG/AAA, their big downfall was the state in which they left the site upon their abandonment in June 1988. The court has already assessed a good measure of liability to MIG/AAA for the emergency removal and IRM costs based on this factor. However, the court also finds that failure to properly close the site contributed to contamination at the site that will need to be addressed independent of the emergency removal and IRM costs. Although such contamination is arguably minimal as compared to the site as a whole, its relevance cannot be ignored.

The last factor the court will consider is the level of cooperation and involvement in clean-up of the site. This factor clearly inures to the benefit of BFI and the significant detriment of MIG/AAA. BFI has been a lead performer in the site clean-up while MIG/AAA abandoned the site and refused to cooperate with, or contribute to, the clean-up effort. The sooner and more thoroughly a site can be cleaned up, the less severe its impact will be on the environment. MIG/AAA's recalcitrance is entirely antithetical to the spirit and purpose of CERCLA and other regulatory statutes. The failure of MIG/AAA to provide relevant site information also hindered the clean-up process. The court finds MIG/AAA's lack of cooperation and involvement in the clean-up to weigh heavily in favor of allocating them a greater share of costs.

■ Having considered these various factors carefully, the court must now arrive at a percentage of fault attributable to BFI and MIG/AAA as operators. As emphasized earlier in this order, such task escapes any degree of precision. It is, at best, a matter of "Kentucky windage," grounded on the relevant conduct of the parties. Keeping in mind its discussion of the foregoing factors, the court allocates forty percent of the remaining 44.63 percent of the overall costs to BFI and sixty percent of the remaining 44.63 percent to MIG/AAA.[27] When the orphan shares are distributed using Hengemihle's methodology, this equates to 18.21 percent of the overall costs to BFI and 27.14 percent of the overall costs to MIG/AAA.[28]

■ Turning to BFI and AAA as transporters, the court allocates sixty percent of the 7.77 percent share to AAA and forty percent to BFI.[29] The court bases this allocation on the volume attributable to BFI and AAA as transporters, including the additional Chrysler waste this court has found BFI liable for. Additionally, the court considers not only the added volume of the Chrysler waste but also its toxicity. In doing so, the court recognizes, as it did in allocating the operator share between BFI and MIG/AAA, that it is impossible to quantify with precision the precise impact of the Chrysler waste on either the volume at, or the condition of, the landfill. When the orphan shares are distributed using Hengemihle's methodology,

27. The non-orphan share attributable to the operators is 44.63 percent.

28. Because the court can find no discernable difference in the conduct of MIG and AAA as operators, the court allocates 13.57 percent (½ of 27.14) to MIG and 13.57 percent to AAA.

29. Of the ten percent attributable to the transporter class as a whole, 1.02 percent represents the transporters who settled with plaintiffs and 1.21 percent represents the orphan transporter share. Therefore, the allocation is based on the remaining 7.77 percent.

this equates to 4.74 percent of the overall costs to AAA and 4.21 percent of the overall costs to plaintiffs.

The total past IRM costs through December 31, 1997 with prejudgment interest are $2,754,549.62. Eighty-five percent of this total is $2,341,367.18 to be split evenly between MIG and AAA. The total past non-IRM costs through December 31, 1997 with prejudgment interest are $6,615,026.56. MIG is also responsible for 13.57 percent of this amount, or $897,659.10. AAA is also responsible for 18.31 percent (4.74 percent as a transporter and 13.57 percent as an operator) of this amount, or $1,211,211.36. Consequently, MIG's total share of past response costs incurred by plaintiffs through December 31, 1997 (with interest) is $2,068,342.70, while AAA's total share is $2,381,894.95. MIG is responsible for 42.50 percent of all IRM costs and 13.57 percent of all other site costs incurred after December 31, 1997 which are consistent with the NCP. AAA is responsible for 42.50 percent of all IRM costs and 18.31 percent of all other site costs incurred after December 31, 1997 which are consistent with the NCP.

Judgment is therefore entered for plaintiffs and against MIG Investments, Inc. for $2,068,342.70 in site costs incurred through December 31, 1997, and for 42.50 percent of all IRM costs and 13.57 percent of all other site costs incurred after December 31, 1997 which are consistent with the NCP. Judgment is further entered for plaintiffs and against AAA Disposal Systems, Inc. for $2,381,894.95 in site costs incurred through December 31, 1997, and for 42.50 percent of all IRM costs and 18.31 percent of all other site costs incurred after December 31, 1997 which are consistent with the NCP.